**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 27, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

OMIL COTTO, also known as Omil Gomez, also known as Omil Alfredo Gomez,

      Defendant - Appellant.

No. 19-2182

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:18-CR-002216-JAP-1)**

---

Meredith Esser, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Appellant.

Peter J. Eicker, Assistant United States Attorney (John C. Anderson, United States Attorney, with him on the brief), Office of the United States Attorney, Albuquerque, New Mexico.

---

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

Omil Cotto was charged with three drug and gun-related offenses stemming from a road rage incident. Prior to trial, Cotto filed a motion to suppress evidence officers had obtained from a residence in Albuquerque, New Mexico. He argued (1) the affidavit supporting the warrant did not provide probable cause for the search of the house, and (2) provisions in the warrant authorizing seizure of "all firearm evidence" and "any cellphones" were overbroad. The district court denied the motion to suppress. Cotto then pleaded guilty to lesser charges but expressly preserved his right to appeal the court's order on the suppression motion.

We affirm the district court's denial of the motion to suppress. The good-faith exception to the exclusionary rule applies to the search and seizure here. The officers acted in objectively reasonable reliance on the warrant while conducting the search of the residence. And even if we assume the warrant's cell phone provision was overbroad, that provision can and should be severed from the remaining valid portions of the warrant.

## I. Background

### A. Factual Background

At 2:39 p.m. on May 31, 2018, the Bernallilo County Sheriff's Office received calls about shots fired during a road rage incident in Albuquerque, New Mexico. Detectives responded to the scene of the incident. Upon arriving, they found a woman sitting in a damaged, yellow Chevrolet Camaro. The woman

identified herself and claimed she had been driving the yellow Camaro when a black SUV had struck her car, the SUV's driver fired a gun, and then the SUV sped off.

After speaking with the woman, the detectives checked surveillance footage from a nearby gas station that had captured the entire incident. In the video, a black SUV rear-ended the yellow Camaro. A male driver then exited the Camaro and fired several shots from a gun at the SUV, which fled the scene. Moments later a red Camaro arrived. The woman then got out of the red Camaro and helped the male driver move items from the yellow Camaro into her car. He got into the driver's seat of the red Camaro and drove off while she got into the yellow Camaro and waited for police to arrive.

The woman changed her story when she realized the detectives had obtained surveillance footage of the entire incident. These statements were consistent with what the detectives had observed in the video. She identified her male counterpart as Omil Cotto, her husband. The officers researched Cotto and found that he had been convicted of at least one prior felony. Then the detectives discovered an address on Apodaca Street S.W. in Albuquerque in the DMV database while running a check on his wife's license.

That same afternoon, officers responded to the Apodaca residence and found the red Camaro parked in front of the house with the license plate removed. While officers waited at the residence, a white Nissan arrived. Two males, one of

them Cotto, exited the Nissan and entered the house. Soon thereafter they exited the house and went back to the Nissan. At this point, officers approached both individuals and took them into custody.

At 6:16 p.m., a detective interviewed the man with Cotto. The man who had been with Cotto identified himself as Cotto's brother-in-law. He and his wife lived at the Apodaca residence, along with his wife's father.[1] During the interview, Cotto's brother-in-law described to officers what had transpired over the past several hours. He had arrived home at about 4:00 p.m. and found Cotto's red Camaro parked outside and Cotto in the house. Cotto asked him for a ride to Cotto's house to pick up a different vehicle. When they arrived, Cotto went inside and retrieved a duffle bag containing a rifle. Cotto placed it in the Nissan and told him they needed to return to the Apodaca residence because he had forgotten the keys to his other vehicle there. After arriving back at the Apodaca residence, Cotto entered the house and left the bag inside. Cotto and his brother-in-law exited the house and prepared to leave again in the Nissan. This is when the police approached them.

The detective then interviewed Cotto's sister-in-law. She said Cotto had arrived at the house that afternoon, asking if he could drop off his daughter

---

[1] Cotto's brother-in-law later explained that Cotto, Cotto's wife, and their daughter had stayed at the Apodaca residence for several months until February of 2018. At the time of the search, the house was owned by Cotto's brother-in-law, sister-in-law, and father-in-law.

because he needed to go to the hospital with his wife. She also stated Cotto was carrying a red and black backpack when he initially arrived, but she was unsure what he had done with it.

While officers responded to the Apodaca residence and performed interviews, another detective had returned to the station to write an affidavit supporting a search warrant for the Apodaca residence. The affidavit included a description of the surveillance footage. It also included the following three statements:

- "Deputies on scene researched Omil Cotto[] and found him to be convicted of at least one felony crime within the last 10 years." R., Vol. I at 48.

- "Omil was later apprehended at [the Apodaca Residence] after he arrived as a passenger in a white Nissan." *Id.*

- "It should be noted that the red Chevy Camaro that Omil fled the scene in was also located at [the Apodaca residence]." *Id.*

The affidavit specifically requested the following:

- "Affiant requests permission to seize any and all firearm evidence to include pistols, revolvers, rifles, shotguns etc. as well as any spent casings, live ammunition, holsters etc." *Id.*

- "Affiant requests to seize any cellphones that may be in the home or its contents." *Id.*

-5-

At 6:32 p.m., as officers at the Apodaca residence interviewed Cotto's brother-in-law, the detective submitted his affidavit to a district attorney for review. Having received approval from the district attorney, he then submitted the warrant to a state judge of the Second Judicial District Court of Albuquerque. The state judge telephonically approved the warrant at 7:42 p.m. The final warrant authorized officers to "search forthwith the persons, vehicle, curtilage and place described in the affidavit" and "if the person or property be found there, to seize the person and property and hold for safekeeping until further Order of the Court." *Id.* at 46. The warrant expressly referenced and incorporated the affidavit.

Along with other officers, the same detective who wrote the affidavit then executed the warrant at the Apodaca residence. During the search, the detective found the red and black backpack. Inside, he found two large bundles wrapped in black tape. He believed them to be drugs and sought an amended warrant to seize the bundles. The state judge approved the amended warrant at 9:40 p.m. The substance in the bundles field-tested positive for methamphetamine.

During the search, the executing officers also found and seized a Glock pistol, the license plate of the red Camaro, and the rifle Cotto had brought in the duffle bag. Cotto subsequently waived his Miranda rights and made incriminating statements.

### B. Procedural Background

A grand jury indicted Cotto on three charges: possession with intent to distribute over 500 grams of a mixture containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), discharge of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(iii), and a charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Before trial, Cotto moved to suppress evidence obtained during the search of the Apodaca residence. He argued the state judge had improperly approved the warrant for two reasons. First, the affidavit supporting the warrant did not establish probable cause. Second, the cell phone and firearm provisions of the warrant were overbroad, violating the Fourth Amendment's requirement that warrants "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV.

The district court denied the motion to suppress. The court concluded the warrant was supported by probable cause and, even if it was not, the good-faith exception to the warrant requirement applied. The district court also determined the provision authorizing seizure of "all firearm evidence" was not overbroad. And, because officers did not seize any cell phones during the search, the district court concluded it was irrelevant whether the cell phone provision was overbroad.

Following the district court's denial of his motion to suppress, Cotto pleaded guilty to possession with the intent to distribute 50 or more grams of methamphetamine (21 U.S.C. §§ 841(a)(1) and (b)(1)(A)) and discharge of a

firearm during a drug offense (18 U.S.C. § 924(c)). The plea agreement expressly permitted Cotto to appeal the district court's suppression decision.

## II. Analysis

Cotto makes two arguments about why the district court erred in denying his motion to suppress. First, he contends the district court erred in concluding that the warrant authorizing officers to search and seize evidence from the Apodaca residence was supported by probable cause. Second, he maintains the district court erred in deciding that the warrant satisfied the Fourth Amendment's particularity requirement.

### A. Standard of Review

When we review a district court's denial of a motion to suppress "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Sadlowski*, 948 F.3d 1200, 1203 (10th Cir. 2020) (internal quotation marks omitted). The judge's decision that an affidavit submitted in support of a warrant established probable cause must be given great deference. *Id.* We review "merely to ensure the Government's affidavit provided a 'substantial basis' for reaching that conclusion." *Id.* (quoting *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009)).

The permissible scope of a warrant and whether it may be severed is reviewed de novo. *United States v. Sells*, 463 F.3d 1148, 1153 (10th Cir. 2006). And we also review de novo the applicability of exceptions to the exclusionary rule, such as the good-faith exception. *United States v. Knox*, 883 F.3d 1262, 1268 (10th Cir. 2018).

## B. Unreasonable Search and Seizure

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It outlines a specific way for government officials to establish reasonableness: through the issuance of a warrant that is supported by "probable cause" and "particularly describ[es] the place to be searched, and the persons or things to be seized." *Id.* When a warrant does not meet these requirements, or fall within another exception to the warrant requirement, subsequent searches and seizures violate the Constitution.

Courts regularly suppress evidence obtained in violation of the Fourth Amendment through the exclusionary rule. But the exclusionary rule "is not itself a constitutional guarantee." *Knox*, 883 F.3d at 1273. Rather, it "is a disincentive for law enforcement to engage in unconstitutional activity." *Id.* Whether the exclusionary rule applies in a given case "turns on whether such application will be an effective deterrent against future Fourth Amendment violations." *Id.* Because the exclusionary rule is applied only when it can deter future violations,

the exclusionary rule is subject to several well-known exceptions when this purpose is not met.

Among these is the good-faith exception to the warrant requirement.[2]  Even if a court ultimately determines that a warrant approved by a judge falls short of the constitutional requirements of probable cause or particularity, evidence will not be suppressed if "a law enforcement officer relies in objective good faith on a warrant issued by a detached and neutral magistrate."  *Id.* (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).  The exclusionary rule is not warranted in such instances because suppressing evidence would serve no deterrent effect: "Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them." *Leon*, 468 U.S. at 917.

When determining whether this exception applies in a given case, "we generally presume officers executed a search warrant in objective good faith." *United States v. Campbell*, 603 F.3d 1218, 1230 (10th Cir. 2010).  But this presumption disappears when an affidavit supporting a warrant "is so facially

---

[2]  The district court also concluded, in the alternative, that the search of the Apodaca residence was justified under the inevitable discovery doctrine.  Because the good-faith exception applies, we do not reach the applicability of inevitable discovery in this case.

deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

In assessing whether an officer's reliance on a invalid warrant was reasonable, we can look at the process employed by officers in obtaining the warrant. *See Knox*, 883 F.3d at 1272. For instance, it is indicative of good faith when the officer who prepares an affidavit is the same one who executes a search. *See United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017) ("Although a warrant application or affidavit cannot save a warrant from facial invalidity, it can support a finding of good faith, particularly where, as here, the officer who prepared the application or affidavit also executed the search."). And an officer's efforts to obtain approval of a warrant application from a superior and an attorney also indicate the officer was acting in good faith. *See Knox*, 883 F.3d at 1269 n.5 (citing *Messerschmidt v. Millender*, 565 U.S. 535, 553–55 (2012)).

But when determining whether an officer's reliance was objectively reasonable, our primary focus must be the text of the affidavit supporting the warrant. *See Knox*, 883 F.3d at 1272. We will not consider information an officer knew when he initially sought the warrant but that was not included in the affidavit. *See id.* at 1272–73. The affidavit *itself* must be "sufficiently detailed to merit application of the good-faith exception." *Id.* at 1273. No matter how thorough an officer's process leading to the issuance of a warrant or how much an officer knows that *could* support the warrant, reliance on a warrant is not

-11-

reasonable if the affidavit supporting it is "bare bones" or "devoid of factual support." *United States v. Cordova*, 792 F.3d 1220, 1223 (10th Cir. 2015).

### 1. Was the warrant supported by probable cause?

Warrants must be supported by probable cause. An affidavit provided by the government in support of a warrant establishes probable cause if it evinces a "fair probability that contraband or evidence of a crime will be found in a particular place." *Knox*, 883 F.3d at 1275 (internal quotation marks omitted). In the context of a warrant authorizing the search of a house, an affidavit must establish a substantial nexus between the crime and the place to be searched. *Biglow*, 562 F.3d at 1278–79. "Whether a nexus exists to search a suspect's home depends on the strength of the case-specific evidence that links suspected criminal activity to the home." *United States v. Mora*, 989 F.3d 794, 800 (10th Cir. 2021). In making the nexus determination, courts may consider: "(1) the type of crime at issue, (2) the extent of the suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." *Id.* at 801 (citing *Biglow*, 562 F.3d at 1279). The warrant is valid if the "affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place." *Id.* at 1277 (internal quotation marks omitted).

As described above, even if the warrant authorizing a search was not supported by probable cause, evidence obtained pursuant to the search need not

-12-

be suppressed if the officer executing the warrant acted in good-faith reliance on a judge's approval.  When the search is of a home, the good-faith exception applies if the affidavit supporting the warrant establishes a "minimally sufficient nexus between the illegal activity and the place to be searched."  *United States v. Campbell*, 603 F.3d 1218, 1231 (10th Cir. 2010) (internal quotation marks omitted).  This nexus requirement is less than what is required to show probable cause.  *See United States v. Barajas*, 710 F.3d 1102, 1110–11 (10th Cir. 2013).  To find a minimal nexus, there need not be "hard evidence or personal knowledge of illegal activity link[ing] a Defendant's suspected unlawful activity to his home."  *Campbell*, 603 F.3d at 1231 (internal quotation marks omitted).

Here, two pieces of evidence in the affidavit connect Cotto to the Apodaca residence.  First, the red Camaro in which Cotto drove away from the shooting was parked outside the residence. Second, Cotto was arrested outside of the residence.[3]  The affidavit also makes clear that all the events took place within a short period of time, roughly four hours.

Cotto maintains this information was inadequate to establish probable cause to search the Apodaca residence.  And he argues that finding probable cause here

---

[3]  Oddly, although the detective knew other pertinent information connecting Cotto to the Apodaca residence—he had been told by officers at the scene that Cotto had entered and exited the house and he knew the address was connected to Cotto's wife—that information was not included in the affidavit. Since this information was not in the affidavit, we cannot consider it.  *See Knox*, 883 F.3d at 1273.

-13-

would open the door to problematic searches in the future. For example, if a house can be searched every time a suspect's car is parked outside of it, police will be authorized to search untold numbers of residences that are connected to criminal activity by nothing more than sheer happenstance.

In this case, we need not decide whether the warrant was supported by probable cause. The good-faith exception clearly applies. *See Campbell*, 603 F.3d at 1231 ("[W]e bypass [the probable cause inquiry] and conclude the good-faith exception applies.").

First, the process the detective followed when applying for the warrant indicates he was acting in good faith. He received approval from a district attorney before bringing the affidavit to the state judge. And he also carried out the subsequent search of the Apodaca residence.

Second, the affidavit was not so devoid of factual support as to render the detective's reliance on it unreasonable. The affidavit created at least a minimally sufficient nexus between Cotto's criminal activity and the place to be searched. Soon after the red Camaro sped away from the shooting it was found outside the Apodaca residence. And Cotto was then found returning to the car a short time later. The detective executing the warrant could reasonably infer Cotto was using the Apodaca residence to store evidence of his criminal activity—several hours had passed since the road rage incident, Cotto used a gun during the incident, and the car he fled the scene in was parked outside the residence. The facts contained

-14-

in the affidavit could have supported an officer's objectively reasonable good-faith reliance on the warrant.

Cotto suggests our precedent dictates a different outcome. He directs us to several cases in which we held that the affidavit underlying a warrant did not meet the minimal-nexus requirement necessary for the good-faith exception. In *United States v. Gonzalez*, 399 F.3d 1225, 1231 (10th Cir. 2005), we concluded the good-faith exception did not apply when the affidavit listed an address to be searched but contained "no facts explaining how the address was linked to" the defendant. And in *United States v. Dutton*, 509 F. App'x 815 (10th Cir. 2013) (unpublished), we concluded the good-faith exception did not apply when the affidavit lacked any information connecting the defendant to a storage unit to be searched. *Id.* at 818 ("What is missing, however, is *any evidence* that the storage unit to be searched was Defendant's." (emphasis added)).

But these case are distinguishable. In *Gonzalez* and *Dutton*, the government's affidavits contained *no* information linking the places to be searched to the defendants or their criminal activity. The same cannot be said here. The information in the affidavit provides at least a minimal nexus between the crime and house. As described above, the affidavit contained statements that Cotto's car was found outside the house to be searched and that Cotto returned to the address. Given these facts, we cannot say the affidavit was *so devoid* of

factual support as to render the executing officer's reliance on the subsequent warrant approved by a judge objectively unreasonable.

The district court was correct to deny Cotto's motion to suppress. Regardless of whether the warrant was supported by probable cause, the good-faith exception to the warrant requirement applies.

## 2. Was the warrant overbroad?

In addition to being supported by probable cause, warrants must be particular as to the place to be searched and items to be seized. *See* U.S. Const. amend. IV. The Fourth Amendment's particularity requirement is aimed at preventing general warrants. *See United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006). To this end, warrants must "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow." *Sells*, 463 F.3d at 1154 (quoting *United States v. Leary*, 864 F.2d 592, 600 (10th Cir. 1988)).

There is a difference, however, between warrants which are "general" and those which are "overly broad." *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.). General warrants are those that allow government officials to engage in "exploratory rummaging in a person's belongings." *Sells*, 463 F.3d at 1154 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). To be invalidated as general, the warrant must "vest the executing officers with

unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence." *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d at 149 (internal quotation marks omitted). By contrast, an overly broad warrant "describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause." *Id.* (internal quotation marks omitted).

We understand Cotto to be challenging the warrant in this case as overly broad, not as general.[4] But, even if the warrant at issue here is overbroad, suppression of evidence should be "a last resort, not a first impulse." *Sells*, 463 F.3d at 1154 (internal quotation marks omitted). When possible, we apply the doctrine of severance to save an overbroad warrant. Under this doctrine "valid portions of a warrant are severed from the invalid portions and only materials seized under the authority of the valid portions, or lawfully seized while executing the valid portions, are admissible." *Id.* at 1155.

To determine whether the invalid portions of a warrant may be severed from the valid portions we follow several steps: first, divide the warrant in a

---

[4] Cotto insists the firearm provision was invalid because it was not adequately particularized and the cell phone provision was invalid because officers did not have probable cause to search for any cell phones. But he does not clearly articulate whether he believes the warrant here was general or simply contained overbroad provisions. We believe the essence of Cotto's argument is that the warrant was overbroad—officers did not have probable cause to search for any and all firearms and cell phones.

commonsense way, then evaluate the validity of each section, and finally determine whether the sections can be distinguished from one another. *See id.* at 1155–58. Practically, where "each of the categories of items to be seized describes distinct subject matter in language not linked to language of other categories, and each valid category retains its significance when isolated from [the] rest of the warrant, then the valid portions may be severed from the warrant." *Id.* at 1158.

But just because the portions of a warrant *can* be severed does not necessarily mean we *may* sever them in all instances. "[E]very court to adopt the severance doctrine has further limited its application to prohibit severance from saving a warrant that has been rendered a general warrant by nature of its invalid portions despite containing some valid portion." *Id.* at 1158. In such instances, we may save the valid portions of the warrant and admit seized items only if "the valid portions of the warrant make up the greater part of the warrant." *Id.* (internal quotation marks omitted and alterations incorporated). This "greater part" inquiry "focuses on the warrant itself rather than upon the analysis of the items actually seized during the search." *Id.* at 1159. When determining what provisions make up the greater part of a warrant, we will tally the valid and invalid provisions in a warrant. But "merely counting parts, without any evaluation of the practical effect of those parts, is an improperly 'hypertechnical' interpretation of the search authorized by the warrant." *Id.* at 1160. So, we must

use our commonsense, evaluating "the relative scope and invasiveness of the valid and invalid parts of the warrant." *Id.*

When a warrant includes overbroad provisions, the "greater part" inquiry is not necessary to sever the invalid portions of the warrant. Rather, we look to see whether any of the evidence seized was obtained pursuant to the invalid provision. If not, no evidence need be suppressed.

With these principles in mind, we consider their application here. First, we must divide the warrant at issue in a commonsense way. Cotto challenges two portions of the warrant: the firearm and cell phone provisions. As a reminder, the warrant authorized officers to seize "any and all firearm evidence to include pistols, revolvers, rifles, shotguns etc. as well as any spent casings, live ammunition, holsters etc" and "any cellphones that may be in the home or its contents." R., Vol. I at 48. The parties do not dispute that these two clauses are easily divisible.

Next, we evaluate the firearm and cell phone provisions to determine whether each is valid.

We agree with the district court that the firearm provision is valid. After watching the surveillance footage, officers would have known Cotto used a handgun during the road rage incident. But the warrant was not solely focused on the shooting. The affidavit included more information, specifically that Cotto had been "convicted of at least one felony crime within the past 10 years." *Id.* Thus,

under federal law, Cotto was not allowed to possess *any* firearms. *See* 18 U.S.C. § 922(g). Given that the affidavit contained information indicating it was illegal for Cotto to possess any firearms, the warrant's authorization to seize "any and all firearm evidence" was not overbroad. *See United States v. Campbell*, 256 F.3d 381, 389 (6th Cir. 2001) (warrant provision authorizing seizure of "any and all firearms" was not overbroad because officers knew the defendant had committed a previous felony); *cf. United States v. Jimenez*, 205 F. App'x 656, 662 (10th Cir. 2006) (unpublished) ("If the affidavit contained [information about the defendant's felon status], then there would be probable cause to search for 'any firearms' as authorized by the warrant.").

We disagree with the district court about the cell phone provision. The district court did not address Cotto's primary argument that the cell phone provision was overbroad. Instead, the court reasoned that the provision's validity was irrelevant because no cell phones were seized. *See* R., Vol. I at 217 ("Officers did not seize any cellphones in this case so the Court will not address whether the request for cellphones was overbroad."). Our cases, however, expressly require us to look at the warrant's provisions, not the actual items seized. *See Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009) (explaining even if officers performed a "'constitutional search', it is well-settled that 'mere words' in a warrant in and of themselves can violate the Fourth Amendment"). The district court erred by forgoing analysis of the cell phone provision.

We assume, without deciding, that there was not probable cause to seize any cell phones and that the lack of probable cause could not be excused under the good-faith exception to the exclusionary rule. We, therefore, proceed under the assumption that the cell phone provision was invalid.

The next step in severability is distinguishing the valid portions of the warrant from the invalid portions. That is not difficult here. Neither the firearm nor the cell phone provision makes reference to the other and they deal with entirely different types of property to be seized. The provisions are easily distinguishable from one another.

Finally, we conclude that we need not perform the "greater part" inquiry here. The allegedly overbroad cell phone provision does not render the warrant "general." Instead, the warrant specifically identified the items to be seized: firearms and cell phones. Its scope was limited. The *Sells* court instructs us to perform the greater part inquiry only when "the invalid portions so predominate the warrant that the warrant *in essence authorizes a general, exploratory rummaging in a person's belongings*." 463 F.3d 1158 (internal quotation marks omitted) (emphasis added).

So, instead of engaging in the "greater part" inquiry, we simply ensure that all the evidence officers seized was obtained pursuant to the warrant's valid provisions. Through the search, officers seized a Glock pistol, the license plate of the red Camaro, and the rifle Cotto had brought in the duffle bag. They also

found the two black bundles in Cotto's backpack. After obtaining an amended warrant, they discovered that the bundles contained a substance that tested positive for methamphetamine. During the entire search of the residence, the officers did not seize any cell phones.

None of this evidence should be suppressed. Everything was found and seized pursuant to the valid firearm provision and the subsequent amended warrant. Cotto does not argue otherwise. Nor could he. The valid firearm provision authorized officers to search for and seize "pistols, revolvers, rifles, shotguns etc. as well as any spent casings, live ammunition, holsters." R., Vol. I at 48. This provision allowed officers to thoroughly search the house and resulted in the discovery of the evidence the officers ultimately seized.

Because the valid firearms provision is severable from the invalid cell phone provision, none of the evidence obtained during the search should be suppressed.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Cotto's motion to suppress.